**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**QUADIRI AYODELE,**

        **Plaintiff,**

**v.**                                            **Civil Action No. 1:19cv183
                                                   (Judge Kleeh)**

**WARDEN HUDGENS; AUSA FLOWERS;
A.W. MESSER; SIS[1] VANDEVENDER; and
SIS ALDRIDGE,**

        **Defendants.**

## REPORT AND RECOMMENDATION

### I. Introduction

This case was initially filed on September 18, 2019 by the *pro se* Plaintiff, an inmate at FCI Gilmer in Glenville, West Virginia, as a § 2241 habeas action. During a preliminary review of the case, it was discovered that this case had been improperly opened as a § 2241 action, because it was actually raising civil rights claims. Accordingly, by Order entered September 23, 2019, the Clerk was directed to correct the nature of suit and cause of action to reflect that it was a Bivens[2] action, and send the Plaintiff a Notice of Deficient Pleading ("Notice") and the Court-approved forms for filing a Bivens action in this district. ECF No. 5. The Notice advised Plaintiff that he had twenty-one days, or until October 14, 2019, in which to correct his deficient pleadings or risk dismissal of his case. ECF No. 6. By Order entered October 24, 2019, Plaintiff was directed to show cause why his case should not be dismissed for failure to prosecute. ECF No. 9. On October 31, 2019, Plaintiff moved to hold the case in abeyance. ECF No. 11. By Order entered

---

[1] "SIS" stands for the BOP's Special Investigative Service, the agency that investigates crimes, rule infractions, or policy violations committed within the BOP.

[2] Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).

November 6, 2019, Plaintiff's motion for abeyance was construed as a motion for extension of time and granted. ECF No. 13. On December 4, 2019, Plaintiff filed his Court-approved form complaint, motion to proceed as a pauper and supporting documents. ECF Nos. 15, 16, 17, 18. On December 10, 2019, Plaintiff moved to amend his complaint. ECF No. 19. By Order entered December 11, 2019, Plaintiff's second motion to proceed as a pauper was granted and the first was terminated; Plaintiff was permitted to proceed without payment of an initial partial filing fee, although he was assessed the entire fee. ECF No. 20. By separate Order entered the same day, Plaintiff's motion to amend was granted. ECF No. 21. On January 10, 2020, by separate motions, Plaintiff moved for appointed counsel and for a preliminary injunction and temporary restraining order, seeking to be released from the Special Housing Unit[3] ("SHU"). ECF Nos. 23, 24. Plaintiff filed his Amended Complaint on January 13, 2020. ECF No. 25. By Order entered March 5, 2020, Plaintiff's motion for appointed counsel was denied. ECF No. 28.

On March 5, 2020, the undersigned conducted a preliminary review of the file, determined that summary dismissal was not appropriate at that time, and directed the defendants to answer the Amended Complaint. ECF No. 29.

On March 9, 2020, a Report and Recommendation was issued, recommending that Plaintiff's Motion for Preliminary Injunction and Temporary Restraining Order be denied. ECF No. 33. Plaintiff filed objections on March 26, 2020. ECF No. 41.

On April 30, 2020, Defendants moved for an extension of time and consolidated response date; by Order entered May 5, 2020, the motion was granted. ECF Nos. 42, 43. On July 9, 2020, Plaintiff filed another motion for appointed counsel; by Order entered July 10, 2020, the motion was denied. ECF Nos. 51, 52. On August 3, 2020, Defendants filed a Motion to Dismiss or for

---

[3] The SHU separates inmates from the general prison population.

Summary Judgment with a Memorandum in Support and exhibits. ECF Nos. 54, 55. Because

Plaintiff was proceeding *pro se*, on August 4, 2020, a Roseboro Notice was issued. ECF No. 57.

Plaintiff moved for an extension of time; by Order entered August 25, 2020, the extension was

granted. ECF Nos. 60, 61.  On October 1, 2020, an Order Adopting Report and Recommendation

was entered, denying Plaintiff's Motion for a Preliminary Injunction and Temporary Restraining

Order. ECF No. 64.

On October 7, 2020, Plaintiff filed his response in opposition to Defendants' dispositive

motion. ECF No. 66. On November 24, 2020, Plaintiff filed a letter motion to hold the case in

abeyance until the criminal case pending against him in this Court[4] is concluded.  ECF No. 70.

This case is before the undersigned for review, report and recommendation pursuant to LR

PL P 2.

## II. Background

Beginning in March, 2019, FCI Gilmer SIS staff observed suspicious emails being

exchanged between an inmate at FCI Gilmer and his female visitor; on April 4, 2019, Plaintiff

placed a call to a male individual directing him to call a female within the next two days, and

providing him with a phone number at which to reach her. See Incident Report No. 3245953, ECF

No. 55-1 at 21. Plaintiff apparently switched back and forth between English and (possibly)

Swahili during the conversation, but was heard to refer to balloons and visiting. Id. Based upon

---

[4] Counsel was appointed for Plaintiff in that case (United States v. Ayodele, et al., 1:20cr85-1) on July 3, 2019. The three-count indictment, issued on November 5, 2020, describes a scheme in which Ayodele, a fellow prisoner, and that prisoner's wife allegedly conspired to procure and smuggle suboxone into FCI Gilmer. Plaintiff Ayodele and his two co-defendants were charged in Count One with Conspiracy to Introduce and Obtain Prohibited Object (Narcotic), in violation of 18 U.S.C. §§ l791(a)(l), 1791(a)(2), and 1791(b)(l); in Count Two with Attempt to Introduce a Prohibited Object (Narcotic), in violation of 18 U.S.C. §§ 2, 1791(a)(l) and 1791(b)(l).  The female co-defendant was also charged in Count Three with False Statement to a Federal Agency, in violation of 18 U.S.C. § 1001(a)(3). On January 7, 2021, the female co-defendant entered a plea to Count Two. A trial date of April 6, 2021 has been set for Plaintiff and his fellow inmate co-defendant.

this and other evidence, Ayodele and the other inmate were suspected of being involved in a scheme to encourage a female visitor to bring drugs in to FCI Gilmer. See Spearen Decl., ECF No. 55-1, ¶ 4 at 2; see also Incident Report No. 3245953, ECF No. 55-1 at 21.  Ultimately, two days after Plaintiff placed the call, on April 6, 2019, the female visitor arrived at the prison with one-hundred thirty (130) suboxone strips hidden in balloons inside her body. See Incident Report No. 3245953, ECF No. 55-1 at 22. FCI Gilmer staff confronted her; she admitted to bringing in contraband, agreed to give it to staff, and when escorted by female officers to a private rest room, removed two balloons containing suboxone from her body, suboxone which had a street value of $650, but which was worth $19,500 inside a prison.  Id.

FCI Gilmer staff assigned Ayodele and the other inmate to the SHU[5] the same day that the suboxone was discovered. See Spearen Decl., ECF No. 55-1, ¶ 4 at 2; see also BOP Program Statement ("P.S.") 5270.11, Special Housing Units, ECF No. 55-1 at 13 - 19); 28 C.F.R. § 541.21.

FCI Gilmer staff referred the allegations against Ayodele and his fellow prisoner to federal authorities for possible criminal prosecution. See Spearen Decl., ¶ 8 at 3; see also Declaration of Brandon Flowers, Assistant United States Attorney for the Northern District of West Virginia ("Flowers Decl."), ¶¶ 1-3, ECF No. 55-2 at 2. Counsel was appointed to represent Plaintiff on the potential criminal charges. See Flower Decl., ¶ 4 at 2.

### III.  Contentions of the Parties

---

[5] BOP staff generally assign inmates to the SHU while authorities investigate whether the inmate violated BOP policy or criminal law. See Spearen Decl., ¶¶ 5 – 6, ECF No. 55-1 at 2 – 3; see also BOP Program Statement 5270.11, Special Housing Units; Declaration of Brandon Flower, Assistant United States Attorney ("AUSA") for the Northern District of West Virginia ("Flower Decl."), ¶ 9, ECF No. 55-2 at 3; 28 C.F.R. §§ 541.22-23. An inmate can be assigned to SHU in either administrative detention or disciplinary segregation. 28 C.F.R. § 541.22. Administrative detention is a nonpunitive administrative status used to remove the inmate from the general prison population. Id. By contrast, disciplinary segregation is a punitive sanction, used when a BOP disciplinary hearing officer ("DHO") determines that an inmate violated BOP policy. Id. Ayodele was assigned to the SHU in nonpunitive administrative detention. See Inmate History Report, ECF No. 55-1 at 7. The "Z" in the "ASSIGNMENT" column reflects that Ayodele was assigned to the SHU, and the abbreviation "AD" in the "DESCRIPTION" column reflects that Ayodele was in nonpunitive administrative detention.

A. **The Complaint**

In the Amended Complaint, the Plaintiff impliedly alleges a Fifth Amendment due process violation [ECF No. 25 at 7], an implied violation of his Eighth Amendment right to be free from cruel and unusual punishment [id. at 8], and a general allegation that his "rights under the Constitution were violated [id. at 9], contending that for the 9 months since April 6, 2019, all of the Defendants engaged in a scheme to help AUSA Flowers coerce a conviction from him on false charges, in order to "look tough on drugs." Id. Plaintiff alleges he has been held in the SHU in a 12'x18' cell for 23 ½ hours a day, in hopes that he will sign a plea agreement admitting to charges he denies: "attempting to introduce narcotics." ECF No. 25 at 7 - 8. Plaintiff contends that the defendants have lied about him and conducted an unfounded "paltry yet vindictive investigation" into his role in drug smuggling in the prison. Id. at 8 - 9. He avers that both of his co-defendants will attest to his non-involvement in their drug-smuggling scheme. Id. at 3, 4.

More specifically, Plaintiff alleges that Warden Hudgins is culpable for his lack of oversight into the investigation and his failure to permit Plaintiff to have certain amenities denied while in the SHU. ECF No. 25-1 at 2.  Plaintiff alleges that Defendant Messer, as Associate Warden, through "chain of command" personally "falsely corroborated" the allegations against Plaintiff and failed to do his job by investigating the charges before handing them off to the Warden and from there, to AUSA Flowers. ECF No. 25 at 3. Plaintiff contends that SIS Vandevender and Aldridge conducted a shoddy investigation, jumped to conclusions based on insufficient evidence, lied, and signed off on reports based on reckless and unsubstantiated claims that were submitted to the "chain of command." ECF No. 25-1 at 4.

Plaintiff also raises numerous conditions of confinement claims associated with his SHU confinement. Id. at 7 – 8. He alleges that after nine months, federal charges still have not been

brought against him. Id. at 9. He further alleges that his prolonged SHU incarceration has caused him to develop a variety of medical ailments, including an intractable foot fungus, a nail fungus, diminished eyesight, and mental stress. Id.

Plaintiff contends that he exhausted his administrative remedies. Id. at 4 – 6.

As relief, Plaintiff seeks injunctive relief in the form of immediate release from the SHU; a declaration that his rights have been violated; and a preliminary and permanent injunction directing the defendants to either move forward with their charges or release him back to the general population; and compensatory damages of $50,000.00 against each defendant jointly and severally, along with punitive damages in the amount of $50,000.00 against each defendant, costs, and a jury trial. Id. at 9.

Attached to Plaintiff's complaint are a memorandum in support [ECF No. 25-1]; copies of grievances and responses [ECF No. 25-2 at 3 – 6]; a copy of a July 29, 2019 letter from the Clerk of Court to Plaintiff [id. at 7]; a copy of what appears to be a summary of evidence of the incident Plaintiff is charged with, including transcripts of telephone conversations [id. at 8 – 9]; a copy of a December 1, 2019 letter from "P. Duffield, Trust Fund Specialist" to Plaintiff, advising that his account was frozen due to an SIS investigation [id. at 10]; a copy of an FCI Gilmer sick call triage form [id. at 11]; and a copy of a list of items available for purchase, titled "2019 FCI Gilmer Detention List, SHU" and dated October 3, 2019, along with a December 2, 2019 receipt showing available balances on Plaintiff's account. Id. at 12.

B. **Defendants' Motion to Dismiss or for Summary Judgment**

Defendants contend that Plaintiff's complaint should be dismissed or summary judgment granted in their favor because:

1) the declaratory relief Plaintiff requests is not available in a Bivens action [ECF No. 55 at 6 – 7];

2) Plaintiff filed suit without fully administratively exhausting his claims [id. at 7 – 11];

3) even if Plaintiff had exhausted his claims, he cannot pursue these allegations in a <u>Bivens</u> action because they present a new <u>Bivens</u> context in which the Supreme Court has not authorized <u>Bivens</u> liability [id. at 11 – 15];

4) Plaintiff has an alternative, existing process available to him by which he can seek relief for his claims, i.e., the administrative remedy process [id. at 14 – 15];

5) other special factors caution against expanding <u>Bivens</u> liability in this case [id. at 15 – 17];

6) the Defendants are entitled to qualified immunity and/or prosecutorial immunity [id. at 19 – 20];

a) Plaintiff has not established the requisite personal or supervisory liability to impose <u>Bivens</u> liability on any of the Defendants [id. at 20];

b) Plaintiff cannot establish a constitutional claim regarding the prison investigation [id. at 21];

c) Plaintiff cannot establish a viable constitutional claim regarding his confinement in the SHU [id. at 22];

d) Plaintiff cannot establish a viable retaliation claim. Id. at 24.

Attached to Defendants' memorandum in support of their dispositive motion are a sworn Declaration of Destiny Spearen, Paralegal for the Consolidated Legal Center at FCI Beckley ("Spearen Decl.") [ECF No. 55-1 at 2 – 5]; a copy of Plaintiff's Inmate History Quarters [id. at 7 – 11]; a copy of BOP P.S. 5270.11 Special Housing Units [id. at 13 – 29]; a copy of a heavily redacted April 6, 2019 Incident Report No. 3245953 [id. at 21 – 22]; a copy of Plaintiff's Inmate Discipline Data [id. at 24]; a copy of Plaintiff's Administrative Remedy Generalized Retrieval [id. at 26 – 28]; and a sworn Declaration of Brandon Flower, Assistant United States Attorney ("AUSA") for the Northern District of West Virginia ("Flower Decl."). ECF No. 55-2.

**C. <u>Plaintiff's Response in Opposition</u>**

Plaintiff reiterates his version of the facts and his argument in minute, repetitive detail,[6] and attempts to refute the Defendants' argument on the same. ECF No. 66 at 1 – 24. He insists that he had nothing to do with the drug smuggling scheme at the prison; that SIS has believed for 17 months that he was speaking Swahili in the phone call and just recently, it was determined to be Yoruba being spoken; and that the phone number Plaintiff called on April 4, 2019 was not that of the drug-smuggling visitor. Id. at 1 – 2. He contends that SIS investigation has been "shoddy and negligent," and has triggered a chain of events that violated his constitutional rights, causing him to sit "in Solitary Confinement for the past 18 months[.]" Id. at 2. He alleges that AUSA Flowers "took his time" bringing charges, and that the year and a half he spent in the SHU is "the equivalent of placing a person in the county jail on suspicion of jay-walking for 18 months while the prosecutor took his time deciding if he wants to bring forth charges[.]" Id. at 7 – 8. Plaintiff notes that Flowers' affidavit admits that he offered Plaintiff a plea deal on July 5, 2019 and Plaintiff questions why if no formal charges were brought that "an innocent man" was still punished by being held in the SHU for so long. Id. at 8. He describes various difficulties with exhausting his grievances, contending that his attempts to exhaust were impeded by others. Id. at 16 – 18. He now alleges that the Defendants violated his constitutional rights to due process under the Fifth and Fourteenth [sic] Amendments for so long that it now violates the Eighth Amendment's prohibition on cruel and unusual punishment. Id. at 21. He also alleges that the Defendants were negligent in performing their respective duties. Id. at 1, 3, 12, 15, 20.

Attached to his response, Plaintiff included an "Exhibit A," marked "unclassified," which appears to be a "summary translation" of a phone call in English and Yoruba between Plaintiff and

---

[6] Plaintiff's response is twenty-four handwritten pages which appear to have been written in pencil, and some pages appear to have been over-written, probably because he wrote on both sides, in contravention of Local Rule of Prisoner Litigation Procedure ("LR PL P"); consequently, some pages are very difficult to read.

an unknown male [ECF No. 66-1]; an excerpt from research on 28 CFR 541.23 – 541.31 [ECF No. 66-2]; a sworn Declaration by Plaintiff [ECF No. 66-3]; a sworn Declaration from Jose Carmona, a prisoner in FCI Gilmer's SHU [ECF No. 66-4 at 1]; and a sworn Declaration from Keith Mason, another prisoner who spent time in FCI Gilmer's SHU. Id. at 2.

## IV. Standard of Review

### A. Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a case when a complaint fails to state a claim upon which relief can be granted. Dismissal under Rule 12(b)(6) is inappropriate unless it appears beyond doubt that the plaintiff cannot prove any set of facts to support his or her allegations. Revene v. Charles County Comm'rs, 882 F.2d 870 (4th Cir. 1989). Courts, however, are not required to accept conclusory allegations couched as facts and nothing more when ruling on a motion to dismiss pursuant to 12(b)(6). A complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct.1955, 167 L.Ed.2d 929 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level." Id.

To survive a motion to dismiss a plaintiff must state a plausible claim in his complaint that is based on cognizant legal authority and includes more than conclusory or speculative factual allegations. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" because courts are not bound to accept as true a legal conclusion couched as a factual allegation. Id.; see also Nemet Chevrolet, Ltd. v. Comsumeraffairs.com, Inc., 591 F.3d 250 (4th

Cir. 2009). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." Id.

Whether a complaint is legally sufficient is measured by whether it meets the standards for a pleading stated in the Federal Rules of Civil Procedure. See Fed.R.Civ. P 8 (providing general rules of pleading), Fed.R.Civ. P. 9 (providing rules for pleading special matters), Fed.R.Civ. P. 10 (specifying pleading form), Fed.R.Civ. P. 11 (requiring the signing of a pleading and stating its significance), and Fed.R.Civ. P. 12(b)(6) (requiring that a complaint state a claim upon which relief can be granted.) Francis v. Giacomelli, 588 F.3d 186 (4th Cir. 2009).

*Pro se* plaintiffs are entitled to liberal construction of their pleadings. Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251(1976); Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)(per curiam); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978); Gordon v. Leeke, 574 F.2d 1147 (4th Cir. 1978). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, Haines, 404 U.S. at 520, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Id. at 520-21. The mandated liberal construction means only that if the Court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so. Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999). A court may not construct the plaintiff's legal arguments for her. Small v. Endicott, 998 F.2d 411 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." Beaudett v. City of Hampton, 775 F.2d 1274 (4th Cir. 1985).

**B. <u>Motion for Summary Judgment</u>**

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed.R.Civ.P. 56(c). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 248 (1986).

In <u>Celotex</u>, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. <u>Celotex</u>, 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." <u>Matsushita</u>, 475 U.S. at 586. The nonmoving party must present specific facts showing the existence of a genuine issue for trial. <u>Id.</u> This means that the party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.' <u>Anderson</u>, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. <u>Id.</u> at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." <u>Matsushita</u>, 475 U.S. at 587.

## V. <u>Analysis</u>

### A.  <u>Exhaustion of Administrative Remedies</u>

Under the Prison Litigation Reform Act (PLRA), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust all available administrative remedies. 42 U.S.C. § 1997(e)(a). Exhaustion as provided in § 1997(e)(a) is mandatory. <u>Booth v. Churner</u>, 532 U.S. 731, 741 (2001). A <u>Bivens</u> action, like an action under

42 U.S.C. § 1983, is subject to the exhaustion of administrative remedies. Porter v. Nussle, 534 U.S. 516, 524 (2002). The exhaustion of administrative remedies "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes,"[7] and is required even when the relief sought is not available. Booth, at 741. Because exhaustion is a prerequisite to suit, all available administrative remedies must be exhausted prior to filing a complaint in federal court. See Porter, at 524 (citing Booth, 532 U.S. at 741) (emphasis added).

Moreover, in Woodford v. Ngo, 548 U.S. 81, 84 - 85 (2006), the United States Supreme Court found that the PLRA's exhaustion requirement serves three main purposes: (1) to "eliminate unwarranted federal court interference with the administration of prisons;" (2) to "afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case;" and (3) to "reduce the quantity and improve the quality of prisoner suits." Therefore, "the PLRA exhaustion requirement requires full and proper exhaustion." Woodford, at 92-94 (emphasis added). Full and proper exhaustion includes meeting all the time and procedural requirements of the prison grievance system. Id. at 101 - 102.

The Bureau of Prisons provides a four-step administrative process beginning with attempted informal resolution with prison staff (BP-8). See 28 C.F.R. § 542.10, *et seq*. If the prisoner achieves no satisfaction informally, he must file a written complaint, a Request for Administrative Remedy to the warden of the institution on the proper form (BP-9), within 20 calendar days of the date of the occurrence on which the complaint is based. If an inmate is not satisfied with the warden's response, he may appeal to the Regional Director of the BOP using the proper form (BP-10) within 20 days of the warden's response. Finally, if the prisoner has received no satisfaction from the Regional Office, the inmate then  completes the administrative remedy

---

[7] Porter, 534 U.S. at 524.

process by appealing the decision to the Office of General Counsel in Washington D.C., or "Central Office," using the proper form (BP-11) within 30 days of the date the Regional Director signed the response.[8] An inmate is not deemed to have exhausted his administrative remedies until he has filed his complaint at all levels. 28 C.F.R. § 542.10-542.15; Gibbs v. Bureau of Prison Office, 986 F.Supp. 941, 943 (D. Md. 1997). The General Counsel's written response to the inmate's appeal is the final decision of the administrative remedy process, and an inmate is not deemed to have exhausted his or her administrative remedies until the request has been filed and acted upon at all the required agency levels. Id.

Within the BOP record-keeping system, each administrative remedy request is assigned a six-digit numerical ID, or case number, as well as an alpha-numeric suffix. The alpha-numeric suffix identifies the specific level in the administrative review process. Thus, the suffix "F" identifies a remedy request at the institutional (the facility) level, while the letter "R" represents the Regional Office level, and the letter "A" indicates the General Counsel, or the Central Office level. See Williams Decl., ECF No. 69-1 at 3 – 4.  For each specific remedy request, the numerical ID, or case number, remains the same, while the alpha-numeric suffix may change, depending upon the progression of the request through the various levels of administrative review. Furthermore, at each level, the letter is followed by a number, for example, "F1," which indicates the inmate has filed once at the institutional level. If the inmate is rejected at that level and refiles the appeal at that level, the suffix would be "F2." Id.

---

[8] "If accepted, a Request or Appeal is considered filed on the date it is logged into the Administrative Remedy Index as received. Once filed, response shall be made by the Warden or CMM within 20 calendar days; by the Regional Director within 30 calendar days; and by the General Counsel within 40 calendar days . . . If the time period for response to a Request or Appeal is insufficient to make an appropriate decision, the time for response may be extended once by 20 days at the institution level, 30 days at the regional level, or 20 days at the Central Office level. Staff shall inform the inmate of this extension in writing. Staff shall respond in writing to all filed Requests or Appeals. If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level." 28 C.F.R. § 542.18.

In Jones v. Bock, 549 U.S. 199 (2007), the United States Supreme Court ruled, among other things, that an inmate's failure to exhaust under the PLRA is an affirmative defense, and an inmate is not required to specifically plead or demonstrate exhaustion in his complaint. Nonetheless, pursuant to the Court's authority under 28 U.S.C. § 1915, it not foreclosed from dismissing a case *sua sponte* on exhaustion grounds, if the failure to exhaust is apparent from the face of the complaint.  See Anderson v. XYZ Corr. Health Servs., 407 F.3d 674, 681 – 82 (4th Cir. Va. 2005).

Under § 1997e(a), the exhaustion requirement depends on the "availab[ility]" of administrative remedies: An inmate must exhaust available remedies, but need not exhaust unavailable ones." Ross v. Blake, 136 S. Ct. 1850, 1858 (2016).  For example, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use, such as when "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." Ross, 136 S. Ct. at 1859. Or, a remedy might be rendered unavailable because prison administrators thwart inmates from taking advantage of it "through machination, misrepresentation, or intimidation." Ross, 136 S. Ct. at 1860.

Finally, where exhaustion is not apparent from an inmate's pleading, "a complaint may be dismissed on exhaustion grounds so long as the inmate is first given an opportunity to address the issue." Custis v. Davis, 2017 U.S. App. LEXIS 5147 (4th Cir. 2017)(quoting Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008).

 Here, Plaintiff's Amended Complaint asserts that he exhausted his administrative remedies; however, he states that he filed a BP-8 and a BP-9, but did not attach copies of them and got no response to them, and that he filed two BP-10s; he attached a copy of his second BP-10.

ECF No. 25 at 5. He does not say he filed a BP-11.  On the next page, he checked the box to

indicate that he exhausted his available administrative remedies. Id. at 6. He adds

> [t]he BP process is at best a 6 month process, which Plaintiff began filing
> immediately. However due to this institutions [sic] lack of oversight and adherence
> to policy, the B[-]P8 and BP-9 weren't responded to timely, hence, Plaintiff filed a
> BP-10 to the proper outside agency. That BP-10 was denied due to the fact that
> Plaintiff is not in the SHU for any particular DHO report (infraction/write-up). The
> whole BP process was followed by the Plaintiff and met with no results due to his
> case being an "alleged" pending federal case.

Id. Plaintiff attached a copy of an October 22, 2019 BP-10, which is assigned the Administrative

Remedy ID 996776-R2, in which he notes

> I'm appealing the lack of a decision from my BP-9 which I turned in 9/16/19. I
> began the BP-8 process 6 months ago, but it has taken this long to get any response
> ass to why I'm still in the SHU and my account is still froze nearing 7 months now,
> even though I had absolutely nothing to do with anything illegal. I am being
> punished without being found guilty, and just recently I received my discovery from
> this issue, and it shows that the A.W. Messer, and 2 SIS techs fabricated paperwork
> and lied in order to keep me in the SHU. In the discovery it says that I spoke to my
> brother via the phone and told him to call a phone number – they stated this phone
> number (SIS, AW) belongs to a woman who brought drugs into the visiting room
> – however the phone number belongs to a woman who is not involved in drugs or
> on any visiting list, nor was my conversation on the phone pertaining to drugs! The
> SIS and AW are responsible for the egregious violations of my constitutional rights.
> I 'm asking that the region look further into this matter, and ask for proof/evidence
> from the SIS which is factual, and can tie me to any illegal activity – I know for a
> fact that there is none, b/c I do not partake in such activity.  Therefore, I should be
> let OUT of the SHU. This incident which I'm appealing revolves around actions
> illegally taken by the Administration on 4/6/19. I've ben held in the SHU in
> violation of Colon v. Howard – Sandin v. Conner - without being found guilty of
> any charge nor the proper due process (see attached incident report).

ECF No. 25-2 at 3. The Administrative Remedy is stamped as received on November 4, 2019 by

the Mid-Atlantic Regional Office, and as received again by Regional Counsel on December 5,

2019. Id.  Plaintiff also attaches copies of two rejection notices from the Administrative Remedy

Coordinator at the Mid-Atlantic Regional Office ("Regional Office"). One is identified as Remedy

ID 996776-R1, received November 4, 2019, for subject "DHO appeal – combined (procedures,

evidence, & sanctions);" the reason noted for rejection was that Plaintiff did not include a copy of the DHO Report he wished to appeal or identify the charges and dates of the DHO action; he was advised that he could resubmit the appeal in proper form within 10 days of the date of the notice. See ECF No. 25-2 at 5. The other rejection notice was for Remedy ID 996776-R2, received December 5, 2019, for subject "DHO appeal – combined (procedures, evidence & sanctions)" and noting that the regional appeal was being rejected and returned because Plaintiff did not include a copy of the DHO Report he wished to appeal or identify the charges and dates of the DHO action; he was advised that he could resubmit the appeal in proper form within 10 days of the date of the notice. See ECF No.  25-2 at 6.

Defendants contend that the case should be dismissed because Plaintiff failed to complete the exhaustion process. They aver that Plaintiff only ever filed two BOP administrative grievances that addressed the claims in his Amended Complaint,[9] Remedy ID 996776-R1 (a BP-10) was filed in the Regional Office on November 4, 2019 [see Administrative Remedy Generalized Retrieval, ECF No. 55-1 at 28], challenging the investigatory and disciplinary procedures, evidence, and sanctions associated with the April 6, 2019 Incident Report No. 3245953 alleging that Ayodele conspired with others to cause a visitor to smuggle drugs into the prison. See ECF No. 25-2 at 3 - 6. Remedy ID 996776-R1 was rejected because Ayodele did not provide a copy of a Disciplinary Hearing Officer ("DHO") report associated with the challenged discipline, or identify the relevant disciplinary charges and the date associated with the disciplinary action; it directed Ayodele to resubmit the corrected grievance within ten days. Id. at 5. Ayodele resubmitted the corrected grievance (another BP-10) to the Regional Office on December 5, 2019, as Remedy ID

---

[9] The only other two grievances Plaintiff ever filed (Remedy ID 593624-F1 in 2010 and Remedy ID 687912-F1, filed in 2012) were filed well before the claims at issue here, which began in April 2019. See Spearen Decl., ¶ 24 at 4; see also Administrative Remedy Generalized Retrieval, ECF No. 55-1 at 27.

996776-R2. Id. at 6; see also Administrative Remedy Generalized Retrieval, ECF No. 55-1 at 28.

In it, Ayodele alleged he was wrongfully confined in the SHU because of a false and inadequate

investigation of the incident report alleged he had conspired to cause a visitor to bring drugs into

the prison. See Amended Complaint, ECF No. 25-2 at 3 - 6. The Regional Office again rejected

because Ayodele failed to provide a copy of the DHO report associated with the challenged

discipline, or to identify the relevant disciplinary charges and the date associated with the

disciplinary action. Id. at 6. Plaintiff never resubmitted the rejected grievance to the Regional

Office again and did not appeal the grievance to the BOP General Counsel. See Administrative

Remedy Generalized Retrieval, ECF No. 55-1 at 28.

In response, Plaintiff now contends that he exhausted his administrative remedies to his

"fullest capabilities." ECF No. 66 at 16. He alleges that he exhausted until "it became evident that

a barrier had arisen that precluded him from exhausting . . . any further . . . and that [] the staff . .

. were purposely creating impediments" to prevent him from "raising awareness to his plight." Id.

He explains that the "obstacle . . . he couldn't have been expected to overcome" was the instruction

to provide a copy of the DHO report when he resubmitted his BP-10, but because no disciplinary

hearing had ever taken place, no DHO report yet existed for him to attach. Id. Further, he argues

that after his BP-10 was returned the second time, he attempted to file a BP-11

> but was repeatedly denied the proper grievance forms to continue. Each Unit Staff member having their own reasons for not providing the Plaintiff with the proper vehicles to conclude the administrative grievance process. The B-4 Unit counselor claimed he didn't have any, **the B Unit [sic] Case Manager told Ayodele he could not file a BP11 until he had satisfied the BP-10 requirements (which is not a true statement of how the BP process works).** Also the B-Unit manager as well as the head of the SIS on 2 separate occasions informed Ayodele that if he kept filing grievances that "the institution would only keep him segregated in solitary confinement longer." . . . Once the 2nd BP-10 was returned requesting a non-existent DHO report, which the plaintiff couldn't have been able to produce, it created a barrier which precluded the plaintiff from exhausting his administrative remedies any further. Under PLRA there are glaring instances in which EXHAUSTION IS

17

> NOT REQUIRED.  For example, when Ayodele previously informed the court of
> the statement of SIS Superiors . . . who threatened Ayodele with being housed in
> the SHU longer if he kept on filing grievances, or when Ayodele who has put in 5
> BP's since his solitary confinement began, yet only 2 were logged and responded
> to. Or when Ayodele's Unit Team staff, who are directly responsible for handing
> out the grievance forms, either refused to hand them out or didn't make their weekly
> rounds, or repeatedly told the plaintiff that they didn't have any grievance forms.

ECF No. 66 at 17 – 18 (emphasis added). Plaintiff also attaches sworn declarations from two other

SHU inmates;[10] the September 23, 2020 Declaration of Jose Carmona states in pertinent part that:

> I have been incarcerated at Gilmer for 22 months. I have been in and out of the
> [SHU] for 20 of those months, which is where I was able to witness interactions of
> Inmate Aydele [sic], and the unit staff.  Since January [2020] the two of us have
> been cellies.[11]
> I can only attest to a couple incidents I witnessed where the unit staff refused to
> give Aydele [sic] the grievance forms he asked for.  A lot of times the unit staff
> doesn't make their scheduled rounds, I know this because me and him have the
> same unit team.  I also recall one time where the SIS told Aydele [sic] that if he
> keeps filing grievances, they're going to keep him back here even longer.

ECF No. 66-4 at 1. The Declaration of Keith Mason states in pertinent part that:

> I've been on the SHU on the same range with Ayodele since November of 2019. I
> am currently in cell 124 which is 3 cells down from me [sic].
> I remember last year before Christmas when SIS came to Ayodele's and told him
> that if he filed another BP, that they would keep him back here even longer.
> I also remember has [sic] counselor telling him that he couldn't file no BP11 until
> he finished his BP10. In my honest opinion his unit team [is] trying to prevent him
> from filing.

ECF No. 66-4 at 2.

---

[10] Plaintiff also provided his own Declaration, but it did not address the issue of exhaustion. See ECF No. 66-3.

[11] This statement appears to undercut Plaintiff's claim, raised repeatedly for the first time in his response in opposition, that he has been in "solitary confinement" for 18 months. See ECF No. 66 at 3, 6, 7, 9, 12, 13, 16 -17, 19 - 24. Solitary confinement refers to the act of being kept alone in a cell, without being able to see or speak to other prisoners. See Solitary Confinement Law and Legal Definition, *available at:* < https://definitions.uslegal.com/s/solitary-confinement/ > If Plaintiff has had a cellie since January 2020, he can hardly claim he has been held in "solitary confinement" for the entire time. Moreover, Plaintiff's response in opposition also admits that he has not been kept separated from inmate Masias (his co-defendant in the criminal charges) "as the two inmates have been housed a few cells apart for practically the whole 18 months and have been able to communicate the whole 18 months." ECF No. 66 at 23. It appears then, that contrary to Plaintiff's claims about 18 months of "solitary confinement," he has been able to freely communicate and see other inmates while in the SHU.

Plaintiff argues that he should be excused from full exhaustion because he exhausted what he could, given the impossibility of attaching a non-existent DHO report. The undersigned agrees. A careful read of the instructions on the BP-10 rejection notices states "you did not provide a copy of the DHO report you wish to appeal **or identify the charges and date of the DHO action**." See ECF No. 25-2 at 5, 6 (emphasis added). As the Spearen Decl. explains, once the incident was referred to the United States Attorney's Office for criminal prosecution, "BOP disciplinary action was suspended pending review and further investigation by that office." See Spearen Decl., ¶ 9, ECF No. 55-1 at 3. Further, Plaintiff's second BP-10, Remedy ID 996766-R2, attached to his Amended Complaint, indicates that Plaintiff stated that he was "appealing the lack of a decision from my BP-9[12] which I turned in 9/16/19 . . . [and that he had initiated] the BP-8 process 6 months earlier [ECF No. 25-2 at 3]; did not characterize the charges as a DHO proceeding; made it clear he was being criminally investigated; and referenced an attached copy of the Incident Report that clearly set forth the date and type of charges against him, in lieu of the non-existent DHO Report.

The undersigned acknowledges that despite the fact that the Supreme Court has stated that it "will not read futility or other exceptions into statutory exhaustion requirements," Booth, 532 U.S. at 741, n.6, several courts have found that the mandatory exhaustion requirement may be excused in certain limited circumstances. See Ziemba v. Wezner, 366 F.3d 161, 163 (2nd Cir. 2004) (defendant may be estopped from asserting exhaustion as a defense when defendant's actions render grievance procedure unavailable); Mitchell v. Horn, 318 F.3d 523, 529 (3rd Cir. 2003) (summary dismissal for failure to exhaust not appropriate where prisoner was denied forms necessary to complete administrative exhaustion); Dale v. Lappin, 376 F.3d 652, 656 (7th Cir.

---

[12] An appeal of a disciplinary hearing begins with the filing of a BP-10; no antecedent BP-8 or BP-9 is required, as would normally be the case in the usual administrative grievance procedure. See FCI Gilmer Inmate Admission & Orientation Handbook, pp. 44, *available at:* < https://www.bop.gov/locations/institutions/gil/GIL_aohandbook.pdf >

2004) (vacating a grant of summary judgment on exhaustion grounds where the defendants failed to supply any reason for the plaintiff being refused the necessary forms); Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001) (remedy not available within meaning of § 1997e(a) when prison officials prevent a prisoner from utilizing such remedy); Aceves v. Swanson, 75 F. App'x 295, 296 (5th Cir. 2003) (remedies are effectively unavailable where prison officials refuse to give inmate grievance forms upon request). Indeed, the Fourth Circuit has held that "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008).

Furthermore, a number of courts of appeals have held that prison officials' threats of violence can render administrative remedies unavailable. See, e.g., Turner v. Burnside, 541 F.3d 1077, 1085 (11th Cir. 2008); Kaba v. Stepp, 458 F.3d 678, 686 (7th Cir. 2006); Hemphill v. New York, 380 F.3d 680, 688 (2nd Cir. 2004). But see Larkin v. Galloway, 266 F.3d 718, 723-24 (7th Cir. 2001) (failure to exhaust not excused because plaintiff was afraid of retaliation). For threats or intimidation to render administrative remedies unavailable, they must typically be substantial and serious enough that they would deter a similarly situated prisoner of ordinary fitness from pursuing administrative remedies. See Turner, 541 F.3d at 1085; Kaba, 458 F.3d at 684-86; Hemphill, 380 F.3d at 688.

However, here, Plaintiff alternatively alleges that  he was (1) denied the proper forms to file a BP-11, (2) that his B-4 unit counselor claimed not to have any forms, and/or (3) that his B Unit Case Manager told him he could not file a BP-11 until he satisfied the BP-10 requirements, advice that Plaintiff stated "is not a true statement of how the BP process works." ECF No. 66 at 17.  However, Plaintiff's Case Manger's advice to correct his rejected BP-10 before going on to file a BP-11 was not a "false" instruction, as Plaintiff appears to argue, but rather, accurate advice,

because filing a BP-11 to appeal a grievance to the BOP General Counsel *is* a mandatory step in the usual BOP administrative grievance process.[13] Plaintiff's claims that staff refused to provide grievance forms and those of his cellmates notwithstanding, such claims contradict Plaintiff's admission that while confined in the SHU, he was able to obtain the necessary forms to complete a BP-8, a BP-9, and at least two BP-10s, and that his  Unit Case Manager correctly advised him that he had to finish exhausting his BP-10 in order to appeal to the Office of General Counsel via a BP-11.  While Plaintiff also claims that SHU staff threatened to keep him in the SHU longer if he continued to file grievances, this allegation is again belied by the fact that SHU staff did in fact provide Plaintiff with the necessary forms to complete a BP-8, a BP-9, at least two BP-10s, and properly advised him to file a BP-11 to finish exhausting.  Moreover, the threat of a longer SHU stay is not a threat of violence that rises to the level of rendering the administrative remedy process unavailable. See Turner v. Burnside, 541 F.3d at 1085.

Nonetheless, the undersigned finds that the administrative remedy process *was* rendered unavailable to Plaintiff, perhaps not by any actions of FCI Gilmer SHU staff themselves, but certainly at the very least because the Regional Office repeatedly rejected Plaintiff's BP-10s regarding his extended stay in the SHU,  somehow misconstruing them as appeals of a DHO hearing,[14] when it should have been obvious that, consistent with BOP procedure, when an Incident

---

[13] The complete grievance process is explained to every inmate in the FCI Gilmer Inmate Admission & Orientation Handbook, on pp. 41-42; a copy of the handbook is provided to each inmate upon arrival and is *available at:* < https://www.bop.gov/locations/institutions/gil/GIL_aohandbook.pdf >

[14] Without speculation, the undersigned cannot say with certainty whether the SHU staff failed to process the BP-8 and BP-9 that Plaintiff claims he filed, given that Plaintiff failed to attach copies of the same, copies which he should have had within his possession.   The Administrative Remedy Generalized Retrieval, which ostensibly should document all grievances filed, does not reflect that any BP-8 or BP-9 was completed/received. Whether this means that the SHU staff interfered by not processing them for Plaintiff once Plaintiff prepared them cannot be determined upon the record before me.  Because an appeal of a disciplinary hearing begins with the filing of a BP-10 without the usual antecedent BP-8 and BP-9, it is possible, although it seems implausible, that the Regional Office may have assumed that it was a DHO hearing being appealed, given that the Regional Office did not reject the BP-10s for failure to first file a BP-9.

Report is referred to the United States Attorney's Office for criminal prosecution, BOP disciplinary action is suspended, "pending review and further investigation by that office." See Spearen Decl., ¶ 9, ECF No. 55-1 at 3. Accordingly, Plaintiff's claim of prolonged wrongful incarceration in the SHU with its attendant conditions of confinement claims must be given review.

**B. Retaliatory Incarceration in SHU to Coerce Plea to Criminal Charges**

Plaintiff contends that FCI Gilmer BOP staff conspired with AUSA Flowers to falsely and vindictively investigate him for something he did not do to keep him in the SHU until he pled guilty to the criminal charge of conspiring to have drugs smuggled into FCI Gilmer.  Defendants contend that Plaintiff was kept in the SHU both because of the criminal investigation and because "security concerns reflect that he must be separated from another specific inmate at FCI Gilmer." See ECF No. 55 at 2; see also Spearen Decl., ¶¶ 4 – 12.

**1) Qualified Immunity**

Qualified immunity protects government officials from money damages unless it can be shown "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). To determine whether qualified immunity applies, courts must, "as a threshold matter, determine whether a constitutional or statutory right was deprived" and "[i]f there was no deprivation of such a right, then a defendant is entitled to qualified immunity and the Court need not inquire further." Minor v. Yanero, 2008 WL 822102, at *3 (N.D. W.Va. Mar. 26, 2008) (Stamp, J.).

In retaliation claims, "plaintiffs must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994).  Retaliation claims must be supported by

22

"more than naked allegations of reprisal." Id. at 74. Further, this Court has established more stringent standards for retaliation in prisoner cases.

> In the prison context, "a prisoner must allege more than his personal belief that he is the victim of retaliation; that is, mere conclusory allegations of retaliation are not sufficient to state a claim for retaliation." Lerman v. Federal Bureau of Prisons, 2003 WL 22121092, at *7 (N.D. Tex. Sept. 12, 2003) (citing Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997); Woods v. Edwards, 51 F.3d 577, 580 (5th Cir. 1995)). Rather, in this case, the plaintiff must "be prepared to establish but for the retaliatory motive the complained of incident—such as the filing of disciplinary reports . . . —would not have occurred," and he "must produce direct evidence of motivation, or the more probable scenario, 'allege a chronology of events from which retaliation may plausibly be inferred.'" Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995) (quoting Cain v. Lane, 857 F.2d 1139, 1143 n.6 (5th Cir. 1989)).

Caver v. Lane, 2015 WL 9077032, at *3 (N.D. W.Va. Dec. 16, 2015) (Stamp, J.); see also Huang v. Bd. of Governors of Univ. of N. Carolina, 902 F.2d 1134, 1140 (4th Cir. 1990) (requiring that claimants asserting First Amendment retaliation claims under § 1983 actions must show there would have been no retaliation "but for" the claimant's protected expressions); Berry v. McBride, 2004 WL 3266037, at *3 (S.D. W.Va. Nov. 22, 2004) (Faber, C.J.) (citing Huang and holding that plaintiff needed to "demonstrate[] that but for his protected action, he would not have been subjected to the allegedly retaliatory actions") aff'd, 122 Fed.Appx 654 (4th Cir. 2005).

Here, Plaintiff's claim is that based on a single monitored and misconstrued April 4, 2019 phone call he placed to his brother, two days later, on April 6, 2019, when another inmate's female visitor was intercepted with drugs, he was immediately implicated on false charges and placed in the SHU; approximately three months later, when he refused a plea offer, he was kept in the SHU throughout the criminal investigation, which was nine months at the time he filed his complaint.

As an initial point, even if the drug-smuggling conspiracy charges were false, Plaintiff does not have a constitutional right to be free from false disciplinary reports. "The act of filing false disciplinary charges does not itself violate a prisoner's constitutional rights." Lewis v. Viton, No.

23

07-3663, 2007 WL 2362587, at *9 (D. N.J. Aug. 14, 2007) (citing Freeman v. Rideout, 808 F.2d 949, 962-53 (2nd Cir. 1986)). There simply is no constitutional right to be free from being falsely accused. See McClay v. Fowlkes, No. 1:07cv1080, 2008 WL 3992637, *4 n.6 (E.D. Va. Aug. 27, 2008) ("To the extent the plaintiff claims that he was falsely accused, he fails to state a § 1983 claim because '[t]he prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.") (internal citations omitted); Anderson v. Green, No. 082708, 2009 WL 2711885 *4 (D. Md. Aug. 24, 2009); Riggerman v. Ziegler, No. 5:11-0868, 2012 WL 4119674, *5 (S.D. W.Va. Aug. 22, 2012) (inmates have no constitutional right prohibiting false charges against them).

Further, to the extent that Plaintiff may be alleging that any FCI Gilmer defendant violated policy statements and operating procedures by placing him in the SHU or failing to timely release him from the same, he again fails to state a due process claim. A Bivens action "must be founded upon a violation of constitutional rights," Arcoren v. Peters, 829 F.2d 671, 676 (8th Cir. 1987), and "a failure to adhere to administrative regulations does not equate to a constitutional violation." Hovater v. Robinson, 1 F.3d 1963, 1068 n. 4 (10th Cir. 1993) (citing Davis v. Scherer, 468 U.S. 183, 194 (1984)); Petway v. Lappin, No. 5:06-cv-135, 2008 WL 629998, at *5–6 (N.D. W.Va. Mar. 5, 2008) (allegation that prison officials violated policy statements and operating procedures in holding inmate in administrative segregation did not state a due process claim).

Although not specifically pled, Plaintiff has an undeniable constitutional right to a jury trial guaranteed by the Sixth Amendment; liberally construed, Plaintiff's claims do establish an implied allegation of a deprivation of his Sixth Amendment right: that he was retaliated against by being held in the SHU on false unfounded charges. As the Fourth Circuit in Adams demands, Plaintiff must show the retaliation was either in response to his exercising of his Sixth Amendment right or

that the retaliation itself violated a constitutional right. However, the retaliation itself consists of the Plaintiff being housed in the SHU indefinitely, and prisoners have no constitutional right to be in general population or in specific prisons. See, *e.g.*, Moody v. Daggett, 429 U.S. 78, 79 n. 9 (1976); Beveratti v. Smith, 120 F.3d 500, 503–04 (4th Cir. 1997). In order for inmate housing to implicate a Due Process right, it must "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," Sandin v. Conner, 515 U.S. 472, 484 (1995), and despite Plaintiff's strenuous arguments to the contrary, being housed in the SHU or SMU are not atypical hardships. See Beveratti, 120 F.3d at 503 (holding that administrative segregation for six months with vermin, human waste, flooded toilet, unbearable heat, cold food, dirty clothing, no outside recreation, and no education did not constitute atypical as to impose a significant hardship); Robinson v. Norwood, 535 Fed. Appx 81, 83 (3d Cir. 2013) ("Robinson's placement in the SMU [at USP Lewisburg] did not constitute a dramatic departure from the accepted standards for conditions of confinement such that due process was implicated.").

Moreover, other courts that have considered the practice of placing inmates in segregated housing while awaiting criminal investigations have not found a due process violation. Placement of an inmate in administrative segregation for up to one year without an institutional hearing has been upheld where the matter was referred to the FBI for criminal prosecution. Scott v. Craig, No. 9:05-CV-1359 LEK/VEB, 2008 U.S. Dist. LEXIS 90809, 2008 WL 4866051, at *3 - 5 (N.D.N.Y Nov. 7, 2008); see also Delaney v. Ozmint, No. 4:05-1968-HFF-TER, 2006 U.S. Dist. LEXIS 49350, 2006 WL 1878982, at *8 (D.S.C. July 5, 2006) (upheld placement in administrative segregation for 130 days while under investigation); Miller v. Fox, Case No. CV 15-0688 DMG(AFM), 2017 U.S. Dist. LEXIS 65157, 2017 WL 1591939, at *3 (C.D. Cal. Feb. 1, 2017), *report and recommendation adopted*, No. CV 15-06888 DMG (AFM), 2017 U.S. Dist. LEXIS

65151, 2017 WL 1632867 (C.D. Cal. Apr. 28, 2017) (permissible to place inmate in segregation while investigation was pending); United States v. Delgado, No. 97 Cr 0007, 1997 WL 811540, at *1 n. 2 (S.D.N.Y. Apr. 8, 1997) ("Although hearings or review by prison staff are usually required either before or shortly after an inmate is placed in administrative detention, an investigation is suspended when it appears likely than an incident may be the subject of criminal prosecution. A prison staff investigation does not resume until the agency responsible for the criminal investigation advises that further staff investigation may occur."); Williams v. Menifee, No. 5 CIV. 4045 (RWS) 2006 U.S. Dist. LEXIS 60966, 2006 WL 2481823, at *5 (S.D.N.Y. Aug. 25, 2006), *aff'd*, 331 F.App'x 59 (2nd Cir. 2009) (suspension of disciplinary process appropriate where matter referred to United States Attorney's Office for potential criminal prosecution).

Thus, Plaintiff's complaint of a 9-month[15] SHU confinement incident to a criminal investigation to determine his involvement in a prison drug smuggling scheme does not rise to the level of atypical hardship creating a due process violation. Therefore, the retaliatory conduct itself did not violate the constitution, so the only remaining available argument for Ayodele is that Ayodele's exercising of his constitutional right to reject an offer of a plea deal was the reason for the retaliation.

In order to prevail on this argument, precedent demands that Plaintiff prove that "but for" his exercising of his Sixth Amendment right to a jury trial, he would not have continued to be held in the SHU. Plaintiff impliedly argues that his denial of the charges and rejection of the plea deal is the reason he is being held indefinitely in the SHU are punitive, vindictive, malicious acts, and that the Defendant's claim that there is any other reason is just pretext.  Defendants' argument that that there are at least two reasons for Plaintiff's SHU confinement shows that Ayodele's  denying

---

[15] The undersigned recognizes that Plaintiff has now been in the SHU for twice that length of time.

criminal involvement and rejecting a plea deal are not the but-for cause for his confinement in the SHU.

Defendants contend Plaintiff is being held in the SHU not only because of the suspicion of his involvement in the drug-smuggling scheme, but also because of Plaintiff's need to be confined there to avoid another inmate deemed to be a "CIMS Separatee" at the prison. See Spearen Decl., ¶12, ECF No. 55-1 at 3.[16] Plaintiff argues that the Defendants' CIMS "Separatee" explanation "fails" because he has not been kept separated from inmate Masias (his co-defendant in the criminal charges) "as the two inmates have been housed a few cells apart for practically the whole 18 months and have been able to communicate the whole 18 months." ECF No. 66 at 23. Whether Masias is in fact Plaintiff's CIMS Separatee is not apparent from the record.

Plaintiff insists that his confinement in the SHU is retaliatory and vindictive, but this claim appears to be based on nothing more than Plaintiff's speculative assumption that the Defendants want to coerce convictions from any inmate they can, so that they appear to be "tough on drugs." ECF No. 25 at 9. Plaintiff has offered nothing more than speculation and conjecture to account for the reason that he and he alone was singled out for unfounded suspicion, insisting that the evidence does not support his involvement.  Although Plaintiff does allege some that "SIS Superiors . . .

---

[16] The Spearen Declaration notes that even if Plaintiff were not under investigation for the drug-smuggling scheme, he would have been kept in the SHU anyway, because he also has a Central Inmate Monitoring System ("CIMS") assignment of Separation from another inmate at FCI Gilmer, preventing his release back to general population. See Spearen Decl., ¶ 12, ECF No. 55-1 at 3.

A CIMS "Separatee" designation is a determination made pursuant to BOP Program Statement "(BOP P.S.") 5180.05, Central Inmate Monitoring System, that certain inmates must be kept incarcerated separately from one another for various reasons, such as: inmates who have provided witness testimony about others inmates (i.e. "snitches"); those who have threatened government officials; are especially notorious; are members of or affiliated with disruptive groups (i.e., prison gangs), that have a history of disrupting operations/security in prisons, including those inmates who may require separation from a specific disruptive group; state prisoners accepted into the BOP; those who have exhibited aggressive or intimidating behavior towards other specific inmates; inmates from whom there is no identifiable threat, but who must be separated from others at the request of the Federal Judiciary or U.S. Attorneys; inmates who require special management attention, such as inmates with a background in law enforcement or who have been involved in a hostage situation; or inmates who are members of terrorist group with a potential for violence. The Spearen Declaration does not identify what inmate Plaintiff is being separated from or the reason thereto.

threatened [him] with being housed in the SHU longer if he kept on filing grievances [ECF No. 66 at 17 – 18]," these are not allegations that specifically identify any named defendant, sufficient to establish <u>Bivens</u> liability. Moreover, these allegations provide no support for Plaintiff's claim that the transfer to the SHU itself was retaliatory. Plaintiff also impliedly alleges that unnamed SHU staff deliberately impeded the filing of his grievances by making the forms unavailable in various ways, to prevent him from "raising awareness to his plight. <u>Id.</u> at 16. However, these allegations fail, because they are not made against any named defendant.

The burden is on Plaintiff to establish that he was only placed in the SHU because he exercised his Sixth Amendment right. Plaintiff alleges that in May, 2019, Defendant Aldridge "lied to me personally" by telling Plaintiff that if he "signed a C-J-A attorney form that this situation would be over within a matter of days. ECF No. 25-1 at 4. However, the Fourth Circuit has demanded that retaliation allegations be supported by more than "naked allegations of reprisals" and conclusory statements. <u>See Adams</u>, 40 F.3d at 74. There is no evidence in the record to support any allegation of anger or malice on behalf of any of the Defendants other than Plaintiff's own words. There must be a causal connection between the exercise of a constitutional right and the retaliation but there is no sufficient proof above mere allegations of hearsay that links Plaintiff's refusal of the plea to his placement in the SHU. <u>See Maryland Highways</u> <u>Contractors Ass'n, Inc. v. State of Md.</u>, 933 F.2d 1246, 1251 (4th Cir. 1991) (holding that Fourth Circuit has previously held "hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment."). Even though at least two reasons were given to explain Plaintiff's continued confinement in the SHU, either of these reasons would be sufficient under the broad power designated to the BOP that is not to be interfered with or second guessed by courts. <u>See</u>, *e.g.*, 18 U.S.C. § 3621(b); § 4042(a); <u>Bell v. Wolfish</u>, 441 U.S. 520, 547 (1979) ("Prison administrators

therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.").

Further, sentenced inmates are only guaranteed minimal procedural protections for moves to more restrictive conditions. See Williamson v. Stirling, 912 F.3d 154, 176 (4th Cir. 2018). The Fourth Circuit has stated that the Supreme Court "requires that prison officials provide a convicted prisoner 'some notice of the charges against him and an opportunity to present his views' to the deciding official, although that opportunity may be provided after the fact." Id. at 176–77 (quoting Hewitt v. Helms, 459 U.S. 460, 476 (1983)). Here, the plaintiff was given an Incident Report which advised him of the charges stemming from his suspicious phone call, the specific number called, and the expected finding of the smuggled drugs on the person of the visitor, beginning the initiation of the investigation and the placement of Plaintiff and his fellow inmate into the SHU, pending the same. He was appointed counsel to assist him in preparing his defense and help him gather evidence. This process is more than minimal. Additionally, this hearing suffices the Fourth Circuit's standard, because the opportunity to argue against one's confinement may be provided *after* the fact.

In conclusion, Defendants Hudgins, Messer, VanDevender, and Aldridge are entitled to qualified immunity because Plaintiff has not shown that a genuine issue of material fact exists, that he was deprived of a constitutional right, or that his exercising of his Sixth Amendment right to a jury trial was the but-for cause for being placed in the SHU. Plaintiff only provided his own statements and speculation when more is necessary to prove a causal link, so as a matter of law, Plaintiff's claim fails and summary judgment for the Defendants must be granted.

## 2) <u>Defendant AUSA Brandon Flowers' Prosecutorial Immunity</u>

Further, any claim against Defendant AUSA Flowers should be dismissed because Flowers is protected by prosecutorial immunity. Prosecuting attorneys are absolutely immune from individual liability when performing prosecutorial functions. <u>Imbler v. Pachtman</u>, 424 U.S. 409, 422 - 23 (1976); <u>Ostrzenski v. Seigel</u>, 177 F.3d 245, 253 (4th Cir. 1999). For instance, prosecuting attorneys are entitled to immunity when deciding whether to prosecute, even if the decision to prosecute is malicious. <u>Imbler</u>, 424 U.S. at 427. <u>See</u> <u>also</u> <u>Buckley v. Fitzsimmons</u>, 509 U.S. 259, 273, (1993) ("Acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity."). There is an exception to the absolute prosecutorial immunity rule, however, if the prosecuting attorney acts in the role of administrator or investigative officer, rather than as a prosecutor. <u>Imbler</u>, 424 U.S. at 430. Thus, when a court determines whether a prosecuting attorney is entitled to absolute immunity, it must examine the type of activity performed, not the identity of the individual who performed it. <u>Forrester v. White</u>, 484 U.S. 219, 229 (1988).

In this case, Flowers provides a sworn affidavit, attesting that he opened a criminal case against Ayodele in approximately June, 2019 based on a referral from FCI Gilmer SIS staff, alleging Plaintiff conspired with others to bring drugs into the prison; he asked the Court to appoint counsel for Ayodele; on approximately July 5, 2019, he sent a proposed plea agreement to Ayodele's appointed counsel; he contacted that attorney in approximately September 2019 for an update on whether Ayodele had reviewed the plea agreement and was told that additional discovery might be requested; Ayodele's appointed counsel then contacted Flowers in January 2020 to request additional discovery, while Flowers was engaged in a different criminal trial; by the time the attorney contacted Flowers again, Flowers had already been served as a defendant in this

<u>Bivens</u> action and was no longer handling Ayodele's pending criminal charges. <u>See</u> ECF No. 55-2 at 2 – 3. Further, Flowers attested that although he does not participate in the process, he understands that the BOP routinely places inmates in the SHU while it investigates disciplinary violations or possible criminal violations; he is occasionally asked his opinion on whether an inmate should be so placed and he always defers to the BOP's discretion; but that in Ayodele's case, he did not make the decision to transfer Ayodele to the SHU, nor did he recall any discussion with anyone at the BOP regarding whether Ayodele should be placed there, or released back to general population. <u>Id.</u> at 3 – 4.

A review of the docket indicates that Flowers was served in this case on March 10, 2020. <u>See</u> ECF No. 44 at 2. Accordingly, he would have been removed from Ayodele's criminal case at that time. The indictment on the drug-smuggling criminal charges in <u>United States v. Ayodele</u> (Case No. 1:20cr85-1) was not issued until November 4, 2020, eight months after AUSA Flowers had already been replaced as the AUSA handling the case.

Therefore, Plaintiff's allegations that Flowers put him in the SHU "solely for punishment [ECF No. 25 at 7]," was legally responsible for deciding which charges he had sufficient evidence to bring, but failed to timely do so, not only are not all factually correct, they are also all unsupported conclusory allegations that even if true, clearly involve Flowers acting solely in his role as a prosecutor. Thus, Flowers is entitled to prosecutorial immunity and is not a proper defendant in this action.

## C. <u>Bivens</u>

Even though Congress passed 42 U.S.C. § 1983, which allows money damages if a state official violates constitutional rights, there never has been an analogous statute for federal officials. In light of this, the Supreme Court, in <u>Bivens v. Six Unknown Fed. Narcotics Agents</u>, 403 U.S.

31

388 (1971), ruled that even with no statutory authorization there could still be an implied cause of action for damages for people injured by federal officials violating constitutional rights. Bivens suits aim to deter unconstitutional actions by targeting the personal assets of individual federal officials in order. See Carlson v. Green, 446 U.S. 14, 21 (1980).  Liability in a Bivens case is "personal, based upon each defendant's own constitutional violations." Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001). Vicarious liability or *respondeat superior* is not available for a Bivens claim, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009).

Recently, the Supreme Court has reined in the availability of damages remedies in alleged constitutional violations by federal actors and explicitly questioned whether Bivens was decided on sound foundation. See Ziglar v. Abbasi, 137 S. Ct. 1843, 1856 (2017) ("[I]t is possible that the analysis in the Court's three Bivens cases might have been different if they were decided today."). In Abbasi, the Supreme Court marked a substantial shift in how courts are to interpret unconstitutional acts by federal actors when there is no statute permitting a damages remedy. The Court noted that it has only recognized Bivens remedies three times: (1) in Bivens, damages were enforced for violations of the Fourth Amendment's prohibition against unreasonable searches and seizures; (2) in Davis v. Passman, 442 U.S. 228 (1979), the Fifth Amendment Due Process Clause authorized a damages remedy when an employee sued a Congressman for firing her for being a woman; and (3) in Carlson, the Eighth Amendment Cruel and Unusual Punishment Clause provided a damages remedy for failure to provide adequate medical treatment for fatal failure to treat a prisoner's asthma.  Id. at 1854–55.  The Court's explicit message in Abbasi is "clear that expanding the Bivens remedy" to other types of claims "is now a 'disfavored' judicial activity." Id. at 1857 (quoting Iqbal, 556 U.S. at 675).  After Abbasi, there is now a two-step test when

deciding whether a cognizable <u>Bivens</u> remedy exists for alleged official misconduct. First, a court must determine whether the claim presents a "new" <u>Bivens</u> context.  <u>Id.</u> at 1859. If it does, the court must assess whether any "special factors counsel[ ] hesitation" in recognizing a new remedy "in the absence of affirmative action by Congress." <u>Attkisson v. Holder</u>, 2019 WL 1292886, at *11 (4th Cir. Mar. 21, 2019) (published) (quoting <u>Abbasi</u>, 137 S.Ct. at 1857, 1859).

In their dispositive motion, Defendants ask this Court to analyze the instant <u>Bivens</u> claim while considering all the new contours of the recent <u>Abbasi</u> case. However, the undersigned finds that there is no need. There are two elements required at the base of any <u>Bivens</u> claim: (1) that the defendants be personally involved in the alleged offense; and (2) that the claim be based in some constitutional right being violated. These issues should be met before courts use time discussing whether the claim is a new context or any other further analysis. And here, both elements are lacking.

First, the record does not provide evidence to establish that the Defendants were so personally and individually involved with Plaintiff's SHU confinement and the plea deal as to prove retaliation. Plaintiff makes no allegation that any specific individual defendant was actually personally responsible for his alleged retaliation, beyond a conclusory allegation that AUSA Flowers' "intentional actions were with the sole purpose of punishing the plaintiff until he decided to accept a plea." ECF No. 66 at 20.  The claim is more of a claim against the BOP and FCI Gilmer as a whole, which does not satisfy <u>Bivens</u>. Plaintiff has not alleged that any of the FCI Gilmer Defendants ever actually mentioned him being offered or refused a plea deal, beyond his speculative assumption that they were being vindictive by punishing him for suspecting him in the first place, and then for not taking a plea.

33

Specifically, Defendants Hudgins and Messer are only mentioned as the Warden and Associate Warden of FCI Gilmer USP Hazelton, with Hudgins "at the top of the chain of command" and Messer as part of the "chain of command" at the prison [ECF No. 25 at 2 - 3]. Plaintiff generally criticizes both Hudgins and Messer for being "legally responsible" for the actions of other Defendants and exhibiting "lack of oversight." ECF No. 25 at 2, 3; ECF No. 25-1 at 2. Plaintiff does raise a claim that Messer "lied on him" about whose phone number he called on April 4, 2019, permitting the investigation to go forth. ECF No. 25 at 8; ECF No. 25-1 at 3. However, Messer was not the one conducting the investigation; the SIS Defendants VanDevender and Aldridge were.  Supervisory roles alone are not sufficient to bring Bivens claims,[17] and therefore summary judgment in favor of Defendants Hudgins and Messer would be proper. See Iqbal, 556 U.S. at 677.

For any of the other Defendants, there is nothing in the record that can show they are the ones who personally retaliated against Plaintiff by placing him in the SHU to await investigation on potentially valid criminal charges, crimes that could disrupt the orderly operation of the institution, or for refusing the plea deal. For example, Plaintiff says that Defendant Hudgins, as Warden, was in charge of the institution, was aware of the situation, had spoken to him about "how unfortunate this situation is," and was in a position to permit Plaintiff to have more amenities, but still failed to do anything to improve Ayodele's living conditions. ECF No. 25-1 at 2. As noted *supra*, *respondeat superior* is insufficient to support a Bivens claim, and being privy to

---

[17] To the extent Plaintiff may be alleging that Warden Hudgins was deliberately indifferent to his predicament because he failed to grant the BP-9 Plaintiff claims he filed, such an allegation does not state sufficient personal involvement for the imposition of Bivens liability, because denying an inmate's grievances is not the type of personal involvement required to state a Bivens claim. See Fellove v. Heady, 2008 WL 196420, at *4 (N.D.W.Va. Jan. 22, 2008) (stating that "to the extent that the plaintiff may be asserting that these defendants were deliberately indifferent to his needs by denying his administrative grievances, that claim is also without merit as this is not the type of personal involvement required to state a Bivens claim"); Paige v. Kupec, 2003 WL 23274357, at *1 (D. Md. Mar. 31, 2003), aff'd, 70 Fed. Appx. 147 (4th Cir. 2003) (finding that the warden should be dismissed where the only claim against the warden concerned his dismissal of plaintiff's administrative remedy).

information, making rounds, and talking to inmates about their SHU status is not the level of personal involvement needed to prove this <u>Bivens</u> claim because it fails to prove that any particular staff member was the reason for Ayodele's confinement in the SHU.

In addition to the lack of personal involvement, there is no viable constitutional violation alleged. Plaintiff's Sixth Amendment right was not abridged, he is actually exercising this right by refusing the plea deal and choosing to go to trial. Further, as noted *supra*, Plaintiff has no constitutional right to being housed in general population. The goal of <u>Bivens</u> claims are to deter unconstitutional acts by federal actors and there is no deterrence afforded when there are no constitutional violations to deter.

Finally, Plaintiff's multiple allegations regarding the alleged negligence of the FCI Gilmer defendants, raised for the first time in his response in opposition, appears to imply that each FCI Gilmer defendant was not deliberately indifferent, but also negligent in their investigation and/or the dissemination of the reports through the prison "chain of command."  <u>See</u> ECF No. 66 at 1, 3, 12, 20. However, <u>Bivens</u> was created to provide a remedy to clarify that individuals whose constitutional rights are violated by federal officials are entitled to recover for their injuries. In a <u>Bivens</u> claim, plaintiff must allege that the conduct by the government actor was intentional punishment, not mere negligence or gross negligence. <u>McGill v. Duckworth</u>, 944 F.2d 344, 347-48 (7th Cir. 1991), cert. denied, 112 S. Ct. 1265 (1992).

Therefore, a <u>Bivens</u> cause of action in this case cannot prevail and the undersigned recommends that summary judgment be granted to the Defendants.

## VI. <u>Recommendation</u>

In consideration of the foregoing, it is the undersigned's recommendation that Defendants' Motion to Dismiss or for Summary Judgment [ECF No. 54] be **GRANTED** and Plaintiff's Amended Complaint [ECF No. 25] be **DENIED** and **DISMISSED with prejudice.**

Further, the undersigned **RECOMMENDS** that Plaintiff's pending Motion for Case to be Held in Abeyance [ECF No. 70] be **DENIED as moot**.

The parties are notified that this Report and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas S. Kleeh, United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), Rules 6(d) and 72(b), Federal Rules of Civil Procedure, and Rules 1(b) and 8(b) of the Rules Governing Proceedings in the United States District Courts Under Section 2254 of Title 28, United States Code, **any party shall have fourteen days (filing of objections) and then three days (mailing/service), from the date of filing this Report and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.**  Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12. Extension of this time period may be granted by the presiding District Judge for good cause shown.

**Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).  A copy of such objections shall be served on Judge Kleeh.

The Clerk is directed to mail a copy of this Report and Recommendation to the *pro se* plaintiff, via certified mail, return receipt requested, and to transmit a copy electronically to all counsel of record.

In addition, because this Report and Recommendation completes the referral from the District Court, the Clerk is **DIRECTED** to terminate the Magistrate Judge's association with this case.

DATED: January 29, 2021

/s/ *James P. Mazzone*

JAMES P. MAZZONE
UNITED STATES MAGISTRATE JUDGE